IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CT-3226-FL

| | | |
|---|---|---|
| WILLIAM C. CARAWAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| GEORGE SOLOMON, BRAD PERRITT, | ) | |
| LARRY THOMPSON, MARCUS | ) | |
| HOVIS, CORY COLLINS, CLAYTON | ) | |
| BREWER, and GEORGE P. NOLAN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (DE 79), and plaintiff's motion for relief from judgment, (DE 76). The issues raised are ripe for ruling. For the reasons that follow, the court grants the motion for summary judgment and denies plaintiff's motion for relief from judgment.

## STATEMENT OF THE CASE

On September 7, 2016, plaintiff, a state inmate proceeding pro se, filed the instant civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., alleging defendants failed to accommodate his requests for congregational prayer and "Zakat" charity donation, which are mandated by his Islamic faith. Plaintiff named as defendants Brad Perritt ("Perritt"), the Tabor Correctional Institution ("Tabor C.I.") Superintendent; Larry Thompson ("Thompson"), Tabor C.I. Assistant Superintendent; Marcus Hovis ("Hovis"), the Tabor C.I. chaplain; George Solomon ("Solomon"),

North Carolina Department of Public Safety ("DPS") Director of Prisons; Cory Collins ("Collins"), Tabor C.I. corrections officer; Clayton Brewer ("Brewer"), Tabor C.I. corrections officer; and George P. Nolan ("Nolan"), Tabor C.I. Correctional Captain. As relief, plaintiff seeks compensatory and punitive damages, and an injunction mandating that DPS provide plaintiff access to regular congregational prayer and establish a formal Zakat charity donation system at the Tabor C.I.

On April 12, 2017, the court conducted its frivolity review of plaintiff's complaint and directed plaintiff to file particularized complaint on the correct form. Plaintiff filed the amended complaint on May 8, 2017. On May 16, 2017, plaintiff filed motion to appoint counsel. On May 24, 2017, the court conducted its frivolity review of plaintiff's amended complaint, allowed the matter to proceed, and denied plaintiff's motion to appoint counsel. Defendants thereafter filed answer to the amended complaint, denying plaintiff's allegations and asserting various affirmative defenses.

On October 25, 2017, the court entered case management order, which provided February 28, 2018, deadline for completion of discovery. On November 28, 2017, the court granted defendants' request for extension of time to respond to plaintiff's discovery requests, extending such deadline to December 22, 2017. On May 4, 2018, plaintiff filed motion for protective order, requesting stay of all proceeding because defendants allegedly failed to respond to his discovery requests. The court denied plaintiff's motion on June 5, 2018, because plaintiff filed it over two months after discovery closed.

On June 28, 2018, defendants filed motion for summary judgment. On March 18, 2019, the court granted the motion as to plaintiff's claims premised on Zakat charitable donations and

any official capacity claims seeking monetary damages, and denied the motion in all other respects. The court, however, permitted defendants to file renewed motion for summary judgment addressing the remainder of plaintiff's claims.

On April 30, 2019, plaintiff filed the instant motion for relief from judgment, seeking reconsideration of the March 18, 2019, order to the extent it dismissed the Zakat charitable donations claim. Defendants did not respond to this motion.

Defendants filed the instant renewed motion for summary judgment on June 7, 2019. In support, defendants rely upon memorandum of law, statement of material facts, affidavit of George Baysden ("Baysden"), the assistant superintendent for programs at the Tabor C.I., and appendix filed in support of their original motion for summary judgment. The appendix is comprised of the following: 1) affidavits of defendants Thompson and Hovis; 2) defendants' responses to plaintiff's interrogatories; 3) plaintiff's DPS transfer history; 4) DPS administrative grievances plaintiff filed related to his requests for congregational prayer and establishment of Zakat charity fund; 5) DPS's responses to the grievances; 6) the DPS Religious Practices Resources Guide and Reference Manual ("DPS Religious Practices Manual"); 7) correspondence from DPS regional chaplain Susan Addams to plaintiff addressing plaintiff's requests for congregational prayer and establishment of Zakat charity fund; 8) pertinent excerpts from DPS Policy and Procedure Manual addressing religious services in DPS institutions; 9) the Tabor C.I. Chaplaincy Services/Religious Programs policy; and 10) the Tabor C.I. religious services calendar.

Plaintiff responded in opposition on August 19, 2019, relying upon memorandum of law, plaintiff's affidavit, statement of material facts, and the following: 1) affidavit of plaintiff; 2) defendants' responses to plaintiff's discovery requests; 3) DPS Inmate Orientation Handbook; 4)

drawing of plaintiff's housing unit at the Tabor C.I.; 5) envelope accompanying defendants' instant motion for summary judgment; 6) memorandum from Betty Brown, DPS chaplaincy services director; 7) drawing of the blue and green units at the Tabor C.I.; 8) memorandum from former DPS Director of Prisons, Robert C. Lewis; 9) plaintiff's request for religious assistance; 10) declaration of plaintiff; 11) declarations of the following inmates housed at the Tabor C.I.: Reginald Armstrong, Joshua Grooms, Eric Washington, Daniel Peterson, Robert Fennell, Michael Dewayne Rogers, Christopher Daniel Cromartie, Willie Matthews, Evans Aine II, Darrin Reid, and Wayman Godwyn.

## STATEMENT OF THE FACTS

The facts, viewed in the light most favorable to plaintiff, may be summarized as follows. Plaintiff is a practicing Muslim. Plaintiff attests that "it [is] within my beliefs as a Muslim that if there are more than [one] Muslim[s] within an area when the salat (prayer) time comes in . . . that it is obligatory for it to be done in a congregation" and that his faith requires payment of the Zakat charitable donation if it is "within his means." (Pl.'s Decl. (DE 61-2) ¶¶ 8-9).

On August 18, 2016, DPS transferred plaintiff from Lanesboro Correctional Institution to Tabor C.I. (Thompson Aff. (DE 59-1) ¶ 5). After his transfer, plaintiff requested permission to participate in congregational prayer with other Muslims inmates five times per day, either in the communal living area of his housing unit, the outside "yard" of the prison, or the gymnasium. (See generally Pl.'s Aff. (DE 90-1); Request for Religious Assistance (DE 90-14)). According to plaintiff, "Muslim congregational prayer involves certain movements and formation of rows [of Muslim inmates]." (Pl.'s Mem. (DE 90-1) at 4). Additionally, "there is an object which a praying Muslim places in front of him/her in which nobody is supposed to cross between it and

4

the prayer leader called the sutra . . . the shaft of a spear is sufficient but a chair, book or other similarly sized object is sufficient for the sutra." (Pl.'s Aff. (DE 90-1) ¶ 12).

Defendants denied plaintiff's requests, citing the DPS Religious Practices Manual and the Tabor C.I. Chaplaincy Services/Religious Programs policy. (See generally Pl.'s Aff. (DE 90-1)). The DPS Religious Practices Manual recognizes Islam as an approved religion, and contains a section describing the five pillars of Islam. (Hovis Aff., Ex. A (DE 59-2)). The manual provides that one of the five pillars is prayer and that "[f]ive daily prayers . . . are recommended to be done in congregations, but may be done individually in cells, dormitories, or an available clean area which does not negatively affect the security or management of the institution." (Id. at 7).[1] The Tabor C.I. Chaplaincy Services/Religious Programs policy also addresses congregational prayer:

1. Inmates are allowed to study, pray, conduct devotions, and share their faith with one another in their living areas, as is appropriate.

2. No inmate shall organize or conduct group meetings for the purpose of sponsoring a religious activity in their housing unit. These are unauthorized and are not in accordance with established policies at [the Tabor C.I.].

(Id. Ex. D. § .1404, D).

While the foregoing policy nominally permits inmates to pray "with one another in their living areas," defendant Thompson testified that "any gathering of a number of inmates" seeking to engage in congregational or group "worship" at the Tabor C.I. must be monitored and supervised by trained correctional officers, qualified religious volunteers, or a qualified inmate faith helper. (Thompson Aff. (DE 59-1) ¶ 10). The Tabor C.I. religious services calendar provides that the

---

[1] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

only organized (and thus supervised) congregational services offered to Muslims is the Friday Jumu'ah prayers, and a Wednesday "Taleem" educational service. (Hovis Aff. Ex. E (DE 59-2)).

According to Baysden, an assistant superintendent at the Tabor C.I., "accommodating [p]laintiff's apparent request [for] unsupervised congregational prayer will present significant operational and security concerns at [the Tabor C.I.]" (Baysden Aff. (DE 80) ¶ 11). "Specifically, it is possible and likely [in Baysden's experience] that unmonitored inmates will engage in unauthorized or inappropriate behaviors that will negatively impact the entire operation of the facility." (Id. ¶ 12).

The Tabor C.I. is organized into "pods" that typically house approximately 96 inmates[2] per unit, with seven or eight correctional staff members assigned to each unit. (Id. ¶ 14). According to Baysden, "in light of the limited staff assigned to monitor and maintain control of the inmate population [the Tabor C.I.] is not equipped or staffed to facilitate and/or monitor the five . . . daily congregational prayers for Muslim inmates on a regular basis and could not do so fairly or consistently." (Id.). Baysden anticipates that if the institution permits unsupervised congregational prayer for Muslim inmates, then other faith groups will request the same accommodation, and "the facility's inability to accommodate those requests will likely cause discontent and disruption among the inmates." (Id.).

The Tabor C.I. currently has no community volunteers that can supervise congregational worship, and only one inmate faith helper. (Id. ¶ 15). Even if the congregational prayer services could be supervised by an inmate faith helper in the common area of the housing units, there is insufficient corrections staff to supervise such activities in light of the inmate-to-staff ratios set

---

[2] Plaintiff suggests the actual number is 94. The discrepancy makes no difference to the court's analysis set forth below.

forth above, and the disruption that such services would cause other inmates using the common area. (Id. ¶ 17). The Tabor C.I. chapel also cannot accommodate five daily Muslim group worship because the chapel must accommodate services for all religious groups at the Tabor C.I. (Id. ¶ 16 & Ex. A).

## DISCUSSION

A.  Motion for Reconsideration

As noted, plaintiff moves for reconsideration of the court's March 18, 2019, order to the extent the court dismissed his claims related to Zakat charitable giving. Pursuant to Federal Rule of Civil Procedure 54(b),[3] "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Compared to post-judgment Rule 59(e) motions, Rule 54(b) gives district courts "broader flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light." Carlson v. Boston Scientific Corp., 856 F.3d 320, 325 (4th Cir. 2017).

The discretion provided by Rule 54(b), however, "is not limitless." Id. The court may revise an interlocutory order only in the following circumstances: (1) a subsequent trial produces substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice. Id.; see also Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003).

---

[3] Plaintiff's motion relies on Federal Rule of Civil Procedure 60(b). However, Rule 54(b) is the appropriate civil rule because plaintiff seeks relief from an interlocutory order. See Fed. R. Civ. P. 54(b).

Plaintiff has not made the requisite showing. Although plaintiff purports to rely on new evidence he recently discovered, the information cited in plaintiff's motion would not alter the court's determination that plaintiff's inability to pay the Zakat is not the result of defendants' actions. See Carlson, 856 F.3d at 325. Accordingly, the court denies plaintiff's motion for relief from judgment for the reasons stated in the court's March 18, 2019, order.

B.  Motion for Summary Judgment

1.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2. Analysis

Plaintiff alleges defendants violated his rights under RLUIPA and the First Amendment's Free Exercise Clause by prohibiting him from engaging in congregational prayer, with the exception of the Friday Jumu'ah service. The court begins with plaintiff's RLUIPA claim. In relevant part, RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of religion. See 42 U.S.C. § 2000cc-2(b). Here, the court previously held that plaintiff established a triable issue of fact with respect to the substantial burden element of his claim.[4] (DE 67 at 9-13). The court therefore proceeds to RLUIPA's strict scrutiny test.

Under RLUIPA, if a plaintiff establishes defendants substantially burdened his religious exercise, the burden shifts to the defendants to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." 42 U.S.C. § 2000cc-1(a); Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009). Maintaining security and good order is a compelling governmental interest. See Cutter, 544 U.S. at 725 n.13. Prison officials, however, must show that their policy "is the least restrictive means of furthering" security or operational interests. 42 U.S.C. § 2000cc-1(a); Lovelace v. Lee, 472 F.3d 174, 189 (4th Cir. 2006). "This is a strict scrutiny standard, requiring "the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Greenhill v. Clarke, 944 F.3d 243, 250 (4th Cir. 2019) (quoting Holt, 135 S. Ct. at 864);

---

[4] As the court noted in the March 18, 2019, order, defendants do not contest that plaintiff's beliefs are sincerely held, or that congregational prayer is a religious exercise as defined by RLUIPA. (DE 67 at 9).

see also Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012). Although the standard is "exceptionally demanding," see Holt, 135 S. Ct. at 864, "Congress nonetheless anticipated that courts would apply it with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with costs and limited resources." Greenhill, 944 F.3d at 250 (quoting Cutter, 544 U.S. at 723). "While [prison officials] need not conceive of and then reject every possible alternative [to the policy, they do] need to demonstrate that [they] considered and rejected those alternatives set forth by [the plaintiff] both prior to litigation as part of the prison grievance process and through the course of the litigation in the district court." Id. at 251 (citing Holt, 135 S. Ct. at 868 (Ginsburg, J. concurring)).

The court finds defendants have satisfied the strict scrutiny test. Defendants have established compelling governmental interests where they have identified significant administrative, cost, and security burdens associated with permitting all Muslim inmates at the Tabor C.I. to engage in congregational prayer five times a day. See Cutter, 544 U.S. at 725 n.13. Plaintiff does not dispute that the Tabor C.I. has inadequate staffing, religious volunteers, or inmate faith helpers to provide supervision for five daily prayer services. (Baysden Aff. (DE 80) ¶ 15). Unsupervised group worship activities obviously present security concerns, including, for example, facilitation of gang and other illicit activity. (Baysden Aff. (DE 80) ¶ 12); see also Johnson-Bey v. Lane, 863 F.2d 1308, 1310 (7th Cir. 1988) (explaining prison officials are not required "to allow inmates to conduct their own religious services, a practice that might . . . foment conspiracies"); Jones v. Bradley, 590 F.2d 294, 296 (9th Cir. 1979) (upholding prison regulation prohibiting unsupervised group worship services based on security concerns); Guess v. McGill,

No. 9:13-CV-02260-TLW, 2014 WL 5106735, at *11 (D.S.C. Oct. 10, 2014), aff'd, 589 F. App'x 227 (4th Cir. 2015). Furthermore, as reflected in the Baysden affidavit, the inmate-to-staff ratio of seven to eight corrections officers to every 96 prisoners makes it impossible, from a cost, administrative, and security perspective, to accommodate plaintiff's requests for five daily congregate worship services in the communal living areas of the units. (Baysden Aff. (DE 80) ¶¶ 14, 17).

Defendants also have considered and rejected plaintiff's proffered alternatives to their blanket ban on congregate worship outside of the scheduled Wednesday and Friday services. (Id. ¶¶ 12-17). Plaintiff's principal argument is that he should be allowed to engage in congregational prayer when inmates are in the living area of the unit, or the outside "yard" area of the Tabor C.I. Plaintiff notes that he is one of only five Muslim inmates on his unit, and thus allowing him to participate in congregational prayer with the other four inmates will not present a disturbance in the communal living area. Plaintiff also argues that corrections officers are required to supervise groups of inmates playing cards or watching television in the communal living area, and supervising his prayer services is not meaningfully different.

Defendants, however, cannot accommodate plaintiff's request for congregational worship without changing the policy as to all Muslim inmates at the Tabor C.I. (Id. ¶ 14). The Tabor C.I. inmate-to-staff ratios simply do not allow for adequate supervision of all Muslim inmates in a particular Tabor C.I. unit for five daily group prayers, particularly given the staffing ratio and security concerns discussed above. (See id.). Requiring seven or eight correctios officers to maintain supervision over five daily group prayers and the activities of over 90 inmates in the living area simultaneously is not a feasible alternative. (See id.).

Defendants also reasonably note that permitting Muslims inmates a special exception allowing unsupervised congregational prayer may cause security disruptions based on inmate discontent and perceived unfairness.[5] (Id.); see also Adkins v. Kaspar, 393 F.3d 559, 565 (5th Cir. 2004) ("[I]f Adkins were accommodated and other similarly situated small religious groups were not, [Adkins's religious group] could appear to be favored over the others, a perception that could have a negative effect on prison morale and discipline."). The only alternative is allowing all inmates to participate in any reasonable group worship activity whenever they are in a common area of the prison, an obviously unworkable solution given the staffing ratio. (See Baysden Aff. (DE 80) ¶¶ 14). In light of the legitime security and institutional concerns raised by defendants, the court defers to their determination that they cannot accommodate plaintiff's request for five daily congregational worship services by permitting unsupervised group worship activities in the common areas.[6] See Greenhill, 944 F.3d at 250 (noting Congress anticipated that the courts would defer to prison officials' expertise regarding security issues when conducting RLUIPA strict scrutiny analysis).

In his affidavit, plaintiff attests in conclusory fashion that other North Carolina correctional facilities permit congregational prayer in communal areas. (Pl.'s Aff. (DE 90-1) ¶ 16). Plaintiff, however, fails to develop any evidence tending to establish that those facilities have similar staff-

---

[5] Contrary to plaintiff's argument, defendants are not required to wait for an assault, disruption, or other security event to occur before imposing restrictions that are the least restrictive means of furthering compelling governmental interests. See Cutter, 544 U.S. at 723.

[6] Plaintiff acknowledges that he is allowed to engage in solitary prayer in his cell, but suggests that this too is unworkable because it disturbs the other inmate assigned to his cell and otherwise violates various Islamic tenets. Plaintiff's complaint, however, did not allege this as a separate claim for relief, and plaintiff cannot amend the complaint by alleging a new claim in his response brief. Murray Energy Corp. v. Admin. of EPA, 861 F.3d 529, 537 n.5 (4th Cir. 2017); S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184-85 (4th Cir. 2013).

to-inmate ratios or similar security issues to those raised in the Baysden affidavit. For example, if the staffing ratios at those facilities permit supervision of congregational worship, this evidence would not undercut defendants' showing as to RLUIPA's strict scrutiny test.

Plaintiff also argues that Christian inmates are allowed to conduct bible study and pray together in the common areas. As set forth above, the policy prohibiting congregational worship applies to all inmates regardless of religious preference.[7] (See Thompson Aff. (DE 59-1) ¶ 10; Hovis Aff., Ex. D, § .1404, D (DE 59-2)). Thus, plaintiff cannot defeat defendants' strict scrutiny showing by arguing that defendants accommodate Christian inmates' requests for group worship services. To the extent plaintiff is alleging a constitutional violation premised on unidentified corrections officers violating the policy by allowing Christian inmates to organize congregational worship in particular instances, the claim fails because the record is devoid of verified evidence establishing that defendants were responsible for the alleged policy violations.[8] See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018).

Finally, the court addresses plaintiff's First Amendment claim. The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v.

---

[7] Informal bible study may be allowed under the Tabor C.I. policy permitting "inmates to study, pray, conduct devotions, and share their faith with one another in their living areas, as is appropriate." (See Hovis Aff., Ex. D, § .1404, D (DE 59-2)). Here, plaintiff is requesting permission to engage in five daily organized prayer services, not an informal study of religious texts. Plaintiff's request for formal prayer services are not permitted under the policy. (See id.).

[8] Assuming without deciding that some corrections officers allow Christian inmates to organize congregational prayers, but do not allow Muslims to do so, this lawsuit itself supports defendants showing that allowing special accommodations for certain groups will cause potential disruptions.

Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is reasonably related to furtherance of a legitimate governmental or penal interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safely, 482 U.S. 78, 89–91 (1987).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: 1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; 2) whether there are alternative means of exercising the right in question that remain open to prisoners; 3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and 4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89–90.

For the reasons set forth above, defendants have satisfied Turner's reasonable relationship test. Defendants' actions in banning congregational worship are rationally connected to legitimate penological interests in prison security and orderly administration of the institution. Plaintiff has alternative means of exercising the right in question because he is allowed in pray individually in his cell, and he is permitted to attend Friday Jumu'ah prayers. As discussed above, the impact of accommodating plaintiff's request for group worship weighs heavily in favor of defendants, and there are no ready alternatives which accommodate the right and satisfy the penological interest.

In sum, defendants have established their policy prohibiting congregational worship is the least restrictive means of furthering a compelling governmental interest, and that the policy

survives Turner's reasonable relationship test.

**CONCLUSION**

Based on the foregoing, the court GRANTS defendants' renewed motion for summary judgment, (DE 79), and DENIES plaintiff's motion to alter judgment, (DE 76). The clerk is DIRECTED to close this case.

SO ORDERED, this the 31st day of March, 2020.

                                                    LOUISE W. FLANAGAN
                                                   United States District Judge